IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD L. KOCHHEISER, | ) | CASE NO. 1:14-cv-01991 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Edward L. Kochheiser ("Plaintiff" or "Kochheiser") seeks judicial review of the

final decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate

Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I.  Procedural History

Kochheiser filed an application for SSI on August 24, 2011.  Tr. 15, 97, 172-181.   He

alleged a disability onset date of November 1, 2010.[1]  Tr. 15, 97-98, 233.   Kochheiser alleged

---

[1] Kochheiser takes issues with the ALJ's finding that Kochheiser alleged an onset date of November 1, 2010, and
argues that he originally alleged a disability onset date of January 1, 1996.  Doc. 15, p. 2, n. 1.  The record reflects
two alleged onset dates: January 1, 1996 (Tr. 172), and November 1, 2010 (Tr. 97-98, 233).  Kochheiser states that

disability due to myotonic dystrophy, heart problems, prostate cancer, and borderline diabetes.[2]
Tr. 97, 113, 121, 219.  After initial denial by the state agency (Tr. 113-115) and denial upon
reconsideration (Tr. 121-124), Kochheiser requested a hearing (Tr. 125).  A hearing was held
before Administrative Law Judge George D. Roscoe ("ALJ") on March 5, 2013.  Tr. 29-64.

In his March 19, 2013, decision (Tr. 12-28), the ALJ determined that Kochheiser had not
been under a disability since August 24, 2011, the date the application was filed (Tr. 23).
Kochheiser requested review of the ALJ's decision by the Appeals Council.  Tr. 7-11.  On July
19, 2014, the Appeals Council denied Kochheiser's request for review, making the ALJ's
decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

**A.      Personal, educational, and vocational evidence**

Kochheiser was born in 1961.  Tr.32, 172.   He was 51 years old at the time of the
hearing.  Tr.  32.  He received his GED, passing on the first try.  Tr . 34.  Kochheiser was
married and living with his wife in a rental home at the time of the hearing.  Tr. 33.  Kochheiser
served in the United States Navy.  Tr. 34.  According to Kochheiser, he had problems taking
orders and received a less than honorable discharge from the Navy in 1980.  Tr. 34.   Kochheiser
lost his driver's license in 1996 and has never sought reinstatement.  Tr. 33.  He reported that he
does not like to drive.  Tr. 33.

**B.      Medical evidence**

**1.      Treatment history**

---

any discrepancy with respect to the alleged onset date is not relevant.  Doc. 15, p. 2, n. 1.  In light of the foregoing,
the Court does not need to resolve the apparent inconsistency in the record regarding the alleged onset date.

[2] Kochheiser does not challenge the ALJ's decision regarding alleged mental impairments.  Accordingly, evidence
relating to alleged mental impairments is generally not included herein.

On October 26, 2010, Kochheiser saw Dr. Lavinia Cozmin, M.D., to establish care.  Tr. 329-334.  Kochheiser complained of myalgias and arthralgias.  Tr. 329.  He complained of diffuse muscular pain and muscle cramps interfering with his manual activity.  Tr. 329.  Kochheiser also stated that he had developed "shaking" and his wife reported that she had witnessed episodes of "hand cramps progressing upwards, then generalized shaking with rolling up of the eyes."  Tr. 329.  Kochheiser did not recall a full episode and reported that he had not lost control of his bladder nor bit his tongue.  Tr. 329.  On physical examination of Kochheiser's back/spine, Dr. Cozmin commented that "[t]he patient complains of chronic lower back pain, no abnormalities noted."  Tr. 332.  On musculoskeletal physical examination, Dr. Cozmin commented that "[t]he patient complains of joint muscle pain and stiffness.  Deformity of left hand noted s/p reconstructive surgery after tow motor accident.  The patient complains of muscle spasms and tremors in bilateral hands, none noted at the time."  Tr. 332.  Neurologically, Dr. Cozmin observed no sensory loss; no motor weakness; balance, gait, and coordination intact.  Tr. 332.  Fine motor skills were normal and deep tendon reflexes were preserved and symmetric.  Tr. 333.  Dr. Cozmin assessed: polyuria; polydipsia; nocturia; elevated blood pressure reading without diagnosis of hypertension, asymptomatic; muscle weakness (generalized); joint pain, unspecified; and myoclonus, recurrent.  Tr. 333.  With respect to Dr. Cozmin's assessment of muscle weakness (generalized), it was noted "doubt myotonic dystrophy, will refer to neurology, r/o seizures, pseudoseizures" – "The patient declines referral to neurology at this point due to lack of insurance.  He is willing to go at a later date after obtaining insurance."  Tr. 333.  Dr. Cozmin ordered labs.  Tr. 333.

On November 2, 2010, Kochheiser saw Dr. Cozmin to discuss lab results and he complained of anxiety.  Tr. 348-349, 355-356.  Dr. Cozmin noted that Kochheiser's lab results

were unremarkable except for a PSA reading over 30. Tr. 348.  She indicated that Kochheiser was symptomatic for prostate hypertrophy (Tr. 348) and assessed elevated prostate specific antigen (PSA) (Tr. 356).  Kochheiser declined a referral to urology due to a lack of insurance. Tr. 356.  Kochheiser reported experiencing anxious and fearful thoughts.  Tr. 348.  He reported feeling very anxious regarding his financial situation, indicating that he was unable to work due to physical problems.  Tr. 348.  Dr. Cozmin assessed anxiety and muscle weakness (generalized). Tr. 356.  She prescribed lorazepam for Kochheiser's anxiety, as needed, and indicated that Kochheiser would continue to monitor his muscle weakness, noting that Kochheiser had a doctor appointment scheduled with a physician covered by Medicaid.  Tr. 356.

On February 6, 2011, Kochheiser was seen at Community Regional Medical Center – Lorain Primary after having slipped and fallen when getting out of a car and hitting his head.  Tr. 295-298.  CT scans of Kochheiser's cervical and lumbar spine were negative for fracture, with minimal degenerative changes noted.  Tr. 299-300. Kochheiser was discharged from the emergency room with a diagnosis of paresthesia and instructions to follow up with his family doctor as needed.  Tr. 296.

On February 8, 2012, Kochheiser saw Dr. Evan Rae, D.O., of Lorain County Health & Dentistry, as a new patient requesting an evaluation for myotonic muscular dystrophy.  Tr. 361-365.  Kochheiser reported a strong family history of the condition.  Tr. 361.  He reported moderate symptoms starting three years prior but worsening over time.  Tr. 361.  His symptoms included his hands locking up and hurting all over; weakness in his hands and legs; dropping objects; and tingling in his hands.  Tr. 361.  Kochheiser also reported a history of borderline diabetes mellitus; prostate cancer; and seizure disorder.  Tr. 361.  Kochheiser had been referred to a urologist by his primary care physician but had not seen the urologist.  Tr.  361.  With

respect to his report of seizures, Kochheiser indicated that he had seizures since age 30 and seizures occurred once or twice each year.  Tr. 361.  He reported that he had never been treated for seizures.  Tr. 361.  His last seizure had occurred three months prior.  Tr. 361.  Kochheiser also complained of back pain, joint pain, muscle weakness, and myalgia.  Tr. 363.  Dr. Rae referred Kochheiser to a neurologist for evaluations regarding seizures and myotonic muscular dystrophy.  Tr. 365.  Dr. Rae also referred Kochheiser to a urologist for his prostate issues.  Tr. 365.  Dr. Rae ordered testing to further assess Kochheiser's weakness, myalgia, and diabetes. Tr. 365.

On March 1, 2012, upon Dr. Rae's referral, Kochheiser saw Dr. Luay Susan, M.D., regarding his prostate issues.  Tr. 368-374.  Kochheiser's PSA was elevated.  Tr. 370.  Dr. Susan recommended a prostate biopsy.  Tr. 370.  On March 14, 2012, Kochheiser underwent the prostate biopsy.  Tr. 375-383.  On March 22, 2012, Kochheiser saw Dr. Susan.  Tr. 413-418.  Dr. Susan diagnosed prostate cancer and discussed options with Kochheiser.  Tr. 415-416.

Upon referral by Dr. Susan, Kochheiser saw Dr. Ossama M. Lashin, M.D., Ph.D., regarding an incidentally detected adrenal mass that had originally been seen on a March 27, 2012, CT of Kochheiser's abdomen.  Tr. 423-425.  Dr. Lashin recommended additional testing, including an abdominal MRI, to evaluate the lesion for possible malignancy or subclinical hormonal hyperfunction, with orders to return for follow up in six months unless further testing was positive.  Tr. 424-425.  On April 17, 2012, an abdominal MRI was performed showing a right adrenal adenoma.[3]  Tr. 426-427.

---

[3] An "adenoma" is "a benign epithelial tumor in which the cells form recognizable glandular structures or in which the cells are clearly derived from glandular epithelium."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 28.

On April 17, 2012, upon referral by Dr. Rae, Kochheiser saw Dr. Dina Y. Boutros, M.D., for her opinion regarding his seizure-like episodes.  Tr. 497-506.  Kochheiser and his wife described Kochheiser's symptoms.  Tr. 497.  They indicated that the first seizure had occurred 4-5 years prior when Kochheiser started shaking and lost consciousness and had "GTC seizure."[4] Tr. 497.  Per Kochheiser's wife, Kochheiser was unresponsive during the episode, which was followed by post ictal confusion for approximately a half hour.  Tr. 497.  A year later, Kochheiser experienced another episode, described as a "complex seizure" during which time Kochheiser remained in a chair and was unresponsive.  Tr. 497.  Kochheiser reported no recollection of the episodes and reported episodic confusion on average once a week.  Tr. 497-498.  He also reported having headaches several times each week, lasting hours, and being treated with Aleve.  Tr. 498.  Dr. Boutros's "encounter diagnosis" included seizure disorder and she ordered some testing, including an MRI of the brain and EEG.  Tr. 500.  Dr. Boutros counseled Kochheiser and discussed seizure precautions with him, including no taking baths; no swimming alone; no using heavy machinery; no using sharp moving objects; avoiding heights; and no driving.  Tr. 500-501.  Dr. Boutros also discussed medication for headaches and seizures. Tr. 501.  Kochheiser indicated he would think about it.  Tr. 501.

On May 8, 2012, upon referral by Dr. Susan , Kochheiser saw Dr. Robert J. Stein, M.D., for a second opinion regarding his prostate cancer.  Tr. 465-469.  Kochheiser reported feeling tired and having no energy.  Tr. 465.  He also reported feeling depressed and scared of his prognosis. Tr. 465.  Dr. Stein recommended surgery to address the prostate cancer.  Tr. 469.  On May 23, 2012, Kochheiser proceeded with the prostatectomy.  Tr. 454-455.  There were no complications.  Tr. 455.

---

[4] "GTC" is not defined in Dr. Boutros's notes.  Tr. 497.

On August 6, 2012, Kochheiser saw nurse practitioner Lynn M. Gaddis with complaints of neck, shoulder, back, hip, and leg pain.  Tr. 529-535.   Nurse Gaddis indicated that lumbar x-rays showed degenerative disk and facet disease.  Tr. 530, 532.  Physical examination revealed no limitations in range of motion.  Tr. 531.  Strength testing was 5/5.  Tr. 531.  Kochheiser's gait and toe and heel walking were normal.  Tr. 531.  Straight leg raising tests were negative.  Tr. 532.  Nurse Gaddis's diagnoses included lumbar spondylosis; facet syndrome, lumbar; malignant neoplasm of prostate; opioid abuse; and sleep disturbance.  Tr. 532-533.  Nurse Gaddis recommended lumbar facet medial blocks, prescribed a trial of doxepine 10 mg; and advised Kochheiser to avoid opioids due to his admitted abuse of opioids and past drug use.  Tr. 533.

On August 24, 2012, Kochheiser proceeded with lumbar facet joint medial branch nerve blocks performed by Dr. Phillippe G. Berenger, M.D.  Tr. 489-491.  Kochheiser was discharged home in stable condition.  Tr. 490.

On August 31, 2012, upon referral by Dr. Stein, Kochheiser saw Dr. Rahul Tendulkar, M.D., to discuss radiation therapy.  Tr. 439-444.  Following his consult, Dr. Tendulkar advised Kochheiser to follow up with Dr. Tendulkar or Dr. Susan if he wanted a referral for treatment.  Tr. 442.

Nurse Gaddis ordered a lumbar spine MRI in September 2012, which was performed on October 5, 2012.  Tr. 507-508.  The MRI results were normal.  Tr. 507.

On October 10, 2012, Kochheiser followed up with Dr. Lashin regarding the adrenal mass.  Tr. 484-486.  Dr. Lashin indicated that a follow up MRI was consistent with a benign adenoma and recommended a CT of Kochheiser's adrenals without contrast in one year.  Tr. 486.

On October 25, 2012, Kochheiser saw Dr. Susan for follow up regarding radiation therapy.  Tr. 391-395.  Kochheiser agreed to proceed with radiation therapy and Dr. Susan

indicated she would refer him to Mercy Cancer Center for treatment so that he could obtain his treatment locally.  Tr. 393.  Dr. Susan noted no neck, back or joint pain.  Tr. 392.

On October 26, 2012, Kochheiser saw nurse Gaddis for follow up regarding the August 2012 lumbar injections.  Tr. 478-480.  Kochheiser indicated that his symptoms had not changed since the injections.  Tr. 478.  He reported back pain extending down his legs bilaterally to his toes with numbness and tingling.  Tr. 478.  He also reported pain extending to his shoulders bilaterally with numbness and tingling in his left fingers.  Tr. 478.  Kochheiser reported a pain level of 9 on a scale of 1-10.  Tr. 478.  He described his pain as sharp, stabbing, aching and burning, with his pain occurring daily.  Tr. 478.  He also indicated that his mid to low back pain felt like a spasm.  Tr. 478.  Nurse Gaddis's testing showed 5/5 strength in Kochheiser's upper and lower extremities; reflexes were symmetrical in the upper and lower extremities; and nerve root tension signs were negative.  Tr. 478.  Nurse Gaddis diagnosed lumbar spondylosis and myalgia.  Tr. 478.  She recommended a trial use of a TENS unit; flexeril for spasms; a trial of Mobic; and follow up in four to six weeks.  Tr. 479.

In November 2012, Kochheiser met with Andrew W. O'Leary, D.O., of Mercy Cancer Center to start radiation therapy.  Tr. 388-390.

### 2.      Opinion evidence

#### a.      Treating source

Dr. Cozmin completed medical forms for Ohio Job & Family Services, wherein Dr. Cozmin indicated she had last seen Kochheiser on November 2, 2010.  Tr. 271-273.  Dr. Cozmin described Kochheiser's medical conditions as including myalgias and arthralgias, chronic; elevated PSA, R/O prostate cancer; adjustment disorder with anxiety; alcohol and tobacco use; and hyperlipidemia.  Tr. 271.  Dr. Cozmin indicated that her findings included Kochheiser

presenting with anxiety, hostility, complaints of diffuse body pain, and nocturia.  Tr. 271.  She

also indicated that physical examination revealed diffuse muscle tenderness and joint tenderness

without effusions and an enlarged prostate.  Tr. 271.  In the physical functional capacity

assessment section of the form, Dr. Cozmin opined that Kochheiser's medical conditions

impacted his ability to stand/walk and lift/carry.  Tr. 272.  Dr. Cozmin opined that Kochheiser

could walk/stand for 6 hours in an 8-hour workday and walk/stand uninterrupted for 1 hour.  Tr.

272.  Dr. Cozmin opined that Kochheiser could lift/carry up to 5 pounds frequently and up to 10

pounds occasionally.  Tr. 272.  She opined that Kochheiser was markedly limited in his

pushing/pulling ability and moderately limited in his bending and handling ability.  Tr. 272.  Dr.

Cozmin explained that the following observations and/or medical evidence led to her findings:

"Diffuse muscle and joint pain will diminish ability to perform physical work.  Anxiety will

interfere with concentration, attendance."  Tr. 272.

Dr. Lashin completed forms for Ohio Job & Family Services, wherein he indicated he

had last seen Kochheiser on April 10, 2012.  Tr. 432-434.  Dr. Lashin noted no limitations in the

physical functional capacity assessment section.  Tr. 433.

### b.    Consultative examining physicians

### *Issam Al-Turk, M.D.*

On November 4, 2010, consultative examining physician Issam Al-Turk, M.D., examined

Kochheiser.  Tr. 274-280.  Kochheiser complained of low back pain and general leg weakness.

Tr. 274.  He denied lower extremity paresthesia.  Tr. 274.  He reported spasms in his fingers and

that he had difficulty in using his left upper extremity over his shoulder.  Tr. 274.  Following a

physical examination, Dr. Al-Turk concluded that, "[b]ased on the objective findings

[Kochheiser] would have difficulty in performing work related activities that requires lifting over

the shoulder level.  Overall, his range of motion is normal.  Sitting, standing, walking, lifting, carrying, holding objects, hearing, speaking, and traveling are not affected."  Tr. 276.

   *Edward Butler, M.D.*

   On October 14, 2011, consultative examining physician Edward Butler, M.D., examined Kochheiser and ordered an x-ray of the lumbar spine.  Tr. 307-311.  The x-ray showed minimal degenerative changes.  Tr. 310, 312.  Manual muscle testing and range of motion testing was normal (Tr. 313-316) with the exception of some reduced range of motion in the dorsolumbar spine (Tr. 315).  Following his examination, Dr. Butler's diagnoses included degenerative disk disease of the lumbar spine; myotonic dysphoric[5] (with a notation that Dr. Butler was unable to elicit myotonia on examination); probable prostate cancer; hypertension; chronic headache; chest pain (etiology undetermined); probable gastroesophageal reflux disease; status post left shoulder hemiarthroplasty; and partial amputation of the distal phalanx of the left ring finger.  Tr. 311. Dr. Butler opined that Kochheiser's prognosis was guarded in light of his prostate cancer, untreated hypertension, and undiagnosed chest pain.  Tr. 311.  Dr. Butler opined that Kochheiser had mild limitations in lifting, pushing, and pulling.  Tr. 311.

   **c.    Reviewing physicians**

   On April 26, 2012, state agency reviewing physician Olga V. Pylaeva, M.D., completed a Physical Residual Functional Capacity Assessment.  Tr. 105-107.  Dr. Pylaeva opined that Kochheiser could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand/walk about 6 hours in an 8-hour day; sit about 6 hours in an 8-hour day; and pushing/pulling ability was unlimited, other than as indicated for lift/carry.  Tr. 106.  Dr. Pylaeva opined that Kochheiser could frequently climb ramps/stairs and ladders/ropes/scaffolds and could frequently

---

[5] Dr. Butler's notes refer to myotonic "dysphoric."  Tr. 311. Elsewhere in the record, the condition is referred to as myotonic "dystrophy."  *See e.g.,* Tr. 19, 46, 361.

10

stoop, kneel, crouch, and crawl.  Tr. 106.  Dr. Pylaeva found that Kochheiser required no

manipulative, visual, communicative, or environmental limitations.  Tr. 106-107.

## C.     Testimonial evidence

### 1.     Plaintiff's testimony

Kochheiser was represented by counsel and testified at the hearing.  Tr. 32-47.

Kochheiser indicated that his back problems were the main reason he was unable to work.  Tr.

35.  He reported that his back hurt constantly and the pain traveled down into his legs but was

mainly in his left leg.  Tr. 35, 37.  He had not undergone physical therapy for his back and does

not wear a brace.  Tr. 37-38.  He tried a TENS unit for two weeks but it did not work well and he

had to return it due to insurance issues.  Tr. 38.  He also indicated that treatment for his back was

put on hold when the doctors discovered the cancer. Tr.  38.

Kochheiser had recently been diagnosed with prostate cancer for which he underwent

surgery and radiation therapy.  Tr. 35.  At the time of the hearing, he was waiting to follow up

with his doctors to see whether the treatment was successful.  Tr. 35-36.  As a result of his cancer

and the recent radiation, he was advised not to do too much until he felt up to it.  Tr. 44.  He was

tired a lot.  Tr. 44.  When asked how his prostate problems affected him, Kochheiser indicated

that he has to go to doctors a lot and urinate a lot.  Tr. 36.  Otherwise, it really did not affect him.

Tr. 36.  Prior to surgery, Kochheiser did not think he had symptoms related to his prostate.  Tr.

44.  He experienced some problems with urinary leakage.  Tr. 44.

In 1995, Kochheiser lost his fourth, ring finger in a tow motor accident.  Tr. 37.  He is

right-handed and is able to pick up a coffee cup or gallon of milk with his hands.  Tr. 38.

However, he indicated that, when it is cold or hot outside, he cannot pick things up with his left

hand.  Tr. 45.  In the early 1980s, Kochheiser had surgery on his left shoulder.  Tr. 39.  As a

result, he has problems lifting his arm.  Tr. 39, 45.  If he reaches his left arm out repeatedly, his shoulder starts grinding after about a half hour.  Tr. 45-46.  Kochheiser indicated that he has spasms in his right hand but is not certain of the cause.  Tr. 46.  A couple of times each day, he has a tingling or numbness in his hands and his feet occasionally go numb as well. Tr. 47.  He indicated that his physicians were looking into whether he might have myotonic dystrophy.  Tr. 46.  He also reported having spasms in his legs and back.  Tr. 46.  At times, he feels unbalanced when he walks.  Tr. 47.

Kochheiser estimated being able to walk for about 20 minutes and stand for about 20 to 30 minutes at a time.  Tr. 38.  He can stoop or squat but it is painful for him to do so.  Tr. 38.  He can sit about 20 minutes at a time.  Tr. 38-39.  Kochheiser estimated being able to lift 20 pounds but did not think he could lift 20 pounds for a period of 5 to 10 minutes.  Tr. 38, 43.  He indicated he did not think he could lift 20 pounds for an hour but he felt he could lift and carry 20 pounds once in a while for a total of a couple of hours each day.  Tr.  43.  Kochheiser reported sleeping a few hours here and there.  Tr. 41.  He takes naps during the day.  Tr. 42.  Generally, he is able to shave and wash his hair on his own.  Tr. 41.  His wife assists him when his back is really hurting.  Tr. 41.  He is able to cook and do light housework.  Tr.  41.  His wife does the laundry because it is down in the basement.  Tr. 41.  Kochheiser goes shopping once every couple of weeks.  Tr. 41-42.  During the day, he watches television and plays on his phone.  Tr. 42.  He used to enjoy camping but had not camped much in the last seven years.  Tr. 42.  The last time he camped was four years ago.  Tr. 42.  He occasionally visits with his sister or grandchildren.  Tr. 42-43.

### 2. Vocational expert's testimony

Vocational Expert Robert Mosley ("VE") testified at the hearing.  Tr. 47-63, 126.  The ALJ asked the VE to assume an individual Kochheiser's age, education and vocational background[6] who was limited to light work with some non-exertional limitations, including no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and no overhead reaching with the left arm.  Tr. 48-49.  The VE indicated that there were jobs existing in significant numbers in the national and regional economy that the hypothetical individual could perform, including (1) cafeteria attendant, a light, unskilled job with over 2,700 in the region, 8,000 in the state, and 280,000 nationwide; (2) inspector and hand packager, a light, unskilled job with over 1,200 in the region, 6,000 in the state, and 100,000 nationwide; and (3) cleaner/polisher, a light, unskilled job with over 1,500 in the region, 6,000 in the state, and 400,000 nationwide.  Tr. 49-50.

For his second hypothetical, the ALJ asked the VE to assume the same individual with the additional limitation that, due to his symptoms from medically determinable impairments, the individual would be off-task at least 20% of the time.  Tr. 50.  The VE indicated that the second described individual would be unable to perform the three identified jobs.  Tr. 50.  The VE added that being off-task 15% or more of the time would preclude the individual from maintaining work on a consistent basis.  Tr. 63.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

---

[6] The ALJ informed the VE that he found that Kochheiser had no vocationally relevant work experience. T r. 48-49.

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his March 19, 2013, decision, the ALJ made the following findings:

1.  Kochheiser had not engaged in substantial gainful since August 24, 2011, the application date.  Tr. 17.

2.  Kochheiser had the following severe impairments: carcinoma of the prostate, status post prostatectomy and radiation therapy; degenerative changes of the cervical and lumbar spine; hypertension; inguinal hernia; status post partial left ring finger amputation; and status post remote left shoulder arthroplasty.  Tr. 17.  Kochheiser's depressive disorder, not otherwise specified, and myotonic dystrophy were non-severe impairments.  Tr. 17-19.

3.  Kochheiser did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 19.

4.  Kochheiser had the RFC to perform  light work except for the following non-exertional limitations: can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; and is precluded from reaching overhead with the left arm.  Tr. 19-21.

5.  Kochheiser had no past relevant work.  Tr. 21.

6.  Kochheiser was born in 1961 and was 50 years old, which is defined as a person closely approaching advanced age.  Tr. 21.

7.  Kochheiser had at least a high school education and was able to communicate in English. Tr. 21.

8.  Transferability of job skills was not an issue. Tr. 21.

9.  Considering Kochheiser's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Kochheiser could perform, including cafeteria attendant, inspector/hand packager; and cleaner/polisher.  Tr. 22-23.

Based on the foregoing, the ALJ determined that Kochheiser had not been under a disability from since August 24, 2011, the date the application was filed.  Tr. 23.

### V. Parties' Arguments

Kochheiser argues that the ALJ failed to comply with the treating physician rule when evaluating Dr. Cozmin's opinion.  Doc. 15, pp. 8-13; Doc. 18, pp. 2-4.  Kochheiser also argues that the ALJ erred by failing to discuss or account for examining neurologist Dr. Boutros's seizure precautions.  Doc. 15, pp. 13-15; Doc. 18, pp. 4-5.  Finally, Kochheiser argues that the ALJ mis-applied the 12-month duration rule by "isolating Kochheiser's fatigue, which was related to his prostate cancer and radiation treatment, from the cancer treatment and symptoms." Doc. 15, pp. 16-17; Doc. 18, pp. 5-6.

In response, the Commissioner argues that the ALJ considered Dr. Cozmin's opinion but reasonably discounted the opinion as inconsistent with the relatively unremarkable physical examination and diagnostic testing results.  Doc. 17, pp. 7-10.  The Commissioner argues that the ALJ did not err with respect to Kochheiser's alleged seizure disorder and, error if any, was harmless because the jobs identified by the VE do not appear to require work that is at odds with Dr. Boutros's seizure precautions.  Doc. 17, pp. 12-14.  Finally, the Commissioner argues that the ALJ properly considered Kochheiser's treatment for prostate cancer and resulting fatigue. Doc. 17, pp. 10-12.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535-536 (6th Cir. 2001); *Boles v. Astrue*, 2008 WL 2952467, * 1 (E.D. Tenn. July 9, 2008) ("The Court may consider evidence in the record, regardless of whether it has been cited by the ALJ.") (citing *Heston*, 245 F.3d at 535).

## A.      The ALJ properly considered the opinion of treating physician Dr. Cozmin

Kochheiser argues that the ALJ failed to evaluate the opinion of his treating physician Dr. Cozmin in accordance with the treating physician rule. Doc. 15, pp.8-13, Doc. 18, pp. 2-4. The Commissioner does not contend that Dr. Cozmin was not a treating physician but argues that the ALJ's assessment of Dr. Cozmin's opinion is supported by substantial evidence and Kochheiser has failed to demonstrate error warranting reversal. Doc. 17, pp. 7-10.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable

clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).   If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

On forms completed for Ohio Job & Family Services,[7] Dr. Cozmin opined that Kochheiser was unemployable and she also offered her opinions regarding Kochheiser's physical functional capacity, finding that Kochheiser was limited to standing/walking for 6 hours in a day and for 1 hour without interruption; limited to lifting up to 5 pounds frequently and 10 pounds occasionally; markedly limited in his ability to push and pull and moderately limited in his ability to bend and handle.  Tr. 272.  Dr. Cozmin's findings were based on her opinion that

---

[7] The form itself is not dated.  However, Dr. Cozmin indicated on the form that she had last examined Kochheiser on November 2, 2010.  Tr. 272.

Kochheiser's diffuse muscle and joint pain would diminish his ability to perform physical work.
Tr. 272.

> With respect to Dr. Cozmin's opinion, the ALJ stated:
>
> The undersigned has rejected the opinion of Dr. Cozmin, as the relatively unremarkable physical examinations and diagnostic testing throughout the treatment record is inconsistent with the severe limitations she suggested in the medical source statement.  Furthermore, whether a claimant is "unemployable" is a vocational decision, not a medical one, and is reserved to the Commissioner (SSR 96-5p).

Tr. 21.

Kochheiser does not challenge the ALJ's rejection of Dr. Cozmin's opinion that Kochheiser was unemployable.  However, he argues that the ALJ erred because he did not specifically mention each of Dr. Cozmin's specific opinions.  Doc. 15, p. 11.  Although the ALJ did not specifically identify each functional limitation contained in Dr. Cozmin's opinion, the ALJ found that Dr. Cozmin's opinion contained severe limitations and the ALJ's decision makes clear that he considered the entirety of Dr. Cozmin's opinion as contained in the Ohio Job & Family Services form dated November 2, 2010.  Tr. 20 (referencing Exhibit 2F, Tr. 270-273).

Kochheiser also argues that that the ALJ erred by failing to apply the required weighing factors and/or did not provide "good reasons" when rejecting Dr. Cozmin's opinion.  Doc. 15, pp. 11-12.  A review of the ALJ's decision as a whole makes clear the ALJ's reasons for rejecting Dr. Cozmin's opinion and those reasons are supported by substantial evidence.  Further, the decision makes clear that the ALJ considered factors under 20 C.F.R. § 416.927(c) when assessing Dr. Cozmin's opinion.  As noted above, the ALJ made clear that he was rejecting Dr. Cozmin's opinion because it was inconsistent with the record as a whole.  Tr. 21.  Further, the ALJ's discussion of other evidence of record makes clear that the ALJ considered and identified

the medical evidence that he found was relatively unremarkable and indicated that such evidence

did not support Dr. Cozmin's opinion.  Tr. 20.

> For example, when discussing Kochheiser's physical impairments, the ALJ stated:

> In terms of the claimant's physical limitations, the objective clinical evidence and treatment history do not support the severity as alleged.  The field office representative noted that the claimant sat comfortably for the duration of the initial interview, and did not exhibit any difficulty standing or walking.  (Exhibit 1E).  Records from Lorain County Department of Job and Family Services (2F, 17F) and Ohio Department of Job and Family Services (14F), confirmed the claimant's history of arthralgias and hypertension, but did not contain findings that support the medical source statement of Lavinia Cozmin, M.D., a treating source who opined that claimant was "unemployable" due to diffuse muscle and joint pains.  Physical examinations throughout the record demonstrated normal gait, strength, sensation, reflexes, pulses, and range of motion in the extremities and spine.  There was also normal grip strength in both hands, and no sign of fine motor limitations.  The claimant also exhibited no signs of neurologic impairment, muscle spasms, or motor weakness, including both of the consultative physical examinations.  (11/4/2010; 10/14/2011, Exhibit 3F, 5F).  An MRI scan showed minimal degenerative changes of the cervical and lumbar spine.  (Exhibit 4F).

Tr. 20.

Kochheiser also appears to argue that Dr. Cozmin's treatment records from October 26,

2010, support the limitations contained in her November 2, 2010, opinion, including marked

limitations in pushing/pulling ability and ability to stand for only one hour at a time, and

therefore the ALJ should not have rejected those opinions.  Doc. 15, pp. 10-11.

Initially, the undersigned notes it is not clear that positive findings contained Dr.

Cozmin's October 26, 2010, treatment notes support the severe limitations found by Dr. Cozmin.

For example, Dr. Cozmin's physical examination of Kochheiser's back/spine on October 26,

2010, showed decreased thoracic and lumbar mobility and positive posterior tenderness in the

spine.  Tr. 332.  However, Dr. Cozmin also noted that, while Kochheiser complained of chronic

lower back pain, there were no abnormalities noted.  Tr. 332.  Dr. Cozmin's musculoskeletal

physical examination showed mild pain with motion; full range of motion in right shoulder; left hand swelling (trace) with mild pain with motion.  Tr. 332.  Dr. Cozmin noted deformity in Kochheiser's left hand s/p reconstructive surgery following a tow motor accident.  Tr. 332.  Yet, while Kochheiser complained of muscle spasm and tremors in his hands bilaterally, Dr. Cozmin indicated that there was none noted at the time. Tr. 332.  Dr. Cozmin's physical examination of Kochheiser's extremities showed normal pulses but edema was present.  Tr. 332.  Dr. Cozmin observed that the edema was non-pitting[8] bilaterally on Kochheiser's hands, but estimated that the severity was "trace."  Tr. 332.  Dr. Cozmin observed no sensory loss or motor weakness and Kochheiser's balance, gait, and coordination were intact.  Tr. 332.  Further, shortly after the October 26, 2010, visit, on November 2, 2010,[9] Dr. Cozmin's physical examination showed normal musculature; no joint deformity or abnormalities; normal range of motion for age; no edema, cyanosis or clubbing; no motor weakness; and balance and gait were intact.  Tr. 356.

Moreover, even if Dr. Cozmin's October 26, 2010, physical examination findings were sufficient to support the severe limitations contained in Dr. Cozmin's November 2, 2010, report, here, the ALJ concluded that the evidence demonstrated relatively unremarkable physical examination findings and diagnostic testing and relied upon that evidence in rejecting Dr. Cozmin's opinion.  Tr. 20, 21.  For example, as discussed by the ALJ, there were relatively unremarkable physical examination findings throughout, including consultative examining physicians' reports.  Tr. 20 (referencing Exhibits 3F and 5F (Tr. 274-280, 307-316), Tr. 21.  Also, as found by the ALJ, diagnostic testing was relatively unremarkable.  Tr. 20, 21, 299 (February 6, 2011, CT scan negative for fracture and showing minimal degeneration), 300

---

[8] Nonpitting edema is "edema in which the tissues cannot be pitted by pressure."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 593.

[9] November 2, 2010, is the date noted on the forms completed by Dr. Cozmin.  Tr. 272. *See* FN 7 above.

(February 6, 2011, CT scan negative for acute fracture and showing minimal degenerative

changes).  The evidence relied upon by the ALJ constitutes substantial evidence in support of his

decision and Kochheiser has not shown otherwise.[10]  Thus, even if there were evidence to

support Kochheiser's claim, since there is substantial evidence to support the ALJ's decision, the

Court may not overturn the Commissioner's decision  *Jones*, 336 F.3d at 477.

Based on the foregoing, the undersigned finds no violation of the treating physician rule

and that the ALJ's decision to reject Dr. Cozmin's opinion as inconsistent with and unsupported

by the record as a whole is supported by substantial evidence.

**B.     Reversal and remand is not warranted with respect to evidence concerning
        Kochheiser's complaints of seizure symptoms and/or neurologist Dr. Boutros's
        April 17, 2012, treatment notes**

Kochheiser contends that he informed the agency that he had a seizure impairment yet the

ALJ ignored evidence regarding his seizures, including April 17, 2012, treatment notes from Dr.

Boutros, whom Kochheiser saw for a consult regarding his complaints of seizure-like episodes.

Doc. 15, pp. 15.   Kochheiser also contends that Dr. Boutros's seizure precautions constitute an

opinion that should have been discussed.  Doc. 15, p. 14.  The Commissioner argues that the ALJ

did not err by not discussing seizure related evidence and, alternatively, the error, if any, was

harmless.  Doc. 17, pp. 12-13.

---

[10] Kochheiser claims that the ALJ's decision that there were no findings of reduced range of motion in the spine or
motor weakness was factually incorrect and therefore remand is warranted.  Doc. 15, pp. 11, 13.  In making his
argument, Kochheiser relies on Dr. Cozmin's October 26, 2010, treatment records showing decreased mobility in
the thoracic and lumbar spine and assessment of muscle weakness (generalized).  Doc. 15, pp. 11, 13.  Kochheiser
appears to contend that Dr. Cozmin's assessment of muscle weakness (generalized) equated to a finding of motor
weakness.  Doc. 15, pp. 11, 13.  However, while Dr. Cozmin assessed muscle weakness (generalized) on October
26, 2010, as part of her physical examination on that date, Dr. Cozmin found no "motor weakness."  Tr. 332.  Thus,
Kochheiser's attempt to equate the two appears unsupported by the record.  Further, a little over one week later, Dr.
Cozmin noted "normal range of motion for age" and "no motor weakness."  Tr. 356.  The ALJ described the
physical examination findings as *relatively* unremarkable and limited Kochheiser to light work in the RFC (Tr. 21
(emphasis supplied)).  Kochheiser has not demonstrated that the ALJ's RFC limitation of light work did not
adequately account for Dr. Cozmin's findings of reduced range of motion in the thoracic and lumbar spine, her
assessment of muscle weakness (generalized), or that the ALJ's finding that the physical examination findings were
relatively unremarkable was inaccurate.  Thus, Kochheiser has not demonstrated the need for remand for further
clarification regarding the ALJ's assessment of Dr. Cozmin's medical records.

As part of a prior application for disability, Kochheiser indicated that one of the conditions that limited his ability to work was seizures (Tr. 74, 199) and he described his seizures as being more like spasms (Tr. 76, 205).  As part of the application for disability at issue in this case, Kochheiser listed myotonic dystrophy, heart problems, prostate cancer, and borderline diabetes as the conditions limiting his ability to work.  Tr. 97, 113, 121, 219.  When asked at the hearing what kept him from working, Kochheiser indicated "[m]y back mainly."  Tr. 35.  Also, at the hearing, Kochheiser spoke about having spasms in his hand and indicated that his doctors wanted him to get checked for myotonic dystrophy.  Tr. 46.  He did not mention seizures.

Under the regulations, a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 416.945(a); 20 C.F.R. § 416.946(c).  In the present application, Kochheiser did not allege disability based on seizures, he has failed to demonstrate that the evidence was relevant, and/or has failed to demonstrate that the evidence would change the outcome.

For example, while Dr. Boutros listed seizure disorder as an "encounter diagnosis," she did not offer her opinion as to the severity of Kochheiser's condition.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1998) ("The mere diagnosis of [a condition] . . . says nothing about the severity of the condition.").  In fact, Dr. Boutros wanted further testing, including an MRI and EEG, and lab work to look for other metabolic factors and discussed but did not prescribe medication for seizures.  Tr. 500-501.  Further, while Dr. Boutros's April 17, 2012, treatment notes reflect that she discussed seizure precautions with Kochheiser, including no taking baths, no swimming alone, no use of heavy machinery, no use of sharp moving objects, avoidance of

heights, and no driving,[11] Dr. Boutros did not indicate that the "precautions" were permanent work preclusive limitations.  Tr. 500-501.

In light of the foregoing, the undersigned concludes that the ALJ's lack of reference to Dr. Boutros or Kochheiser's complaints of seizure-like symptoms was harmless.  *See Rabbers v. Comm'r of Soc. Sec.*, 2008 WL 4151350, * 1 (W.D. Mich. Sept. 4, 2008) (noting the Sixth Circuit's recognition of harmless error analysis) (relying on *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535-536 (6th Cir. 2001)); *Cooley v. Astrue*, 2009 WL 3486019, * (E.D. Ky. Oct. 23, 2009) ("An incorrect application of the regulations is harmless error when the correct application would not change the ALJ's ultimate decision.") (citing *Heston*, 245 F.3d at 535).

Kochheiser also contends that, because there is no evidence that the three jobs listed by the VE would remain available if Dr. Boutros's precautions were included in the RFC, the ALJ's failure to discuss Dr. Boutros was not harmless.  Doc. 15, p. 15.   His argument is without merit. The Commissioner argues that, based on the job descriptions included in Kochheiser's brief (Doc. 15, p. 15), the inspector and hand packager job would remain available even if, based on Dr. Boutros's precaution that Kochheiser not use sharp moving objects, the cafeteria attendant job were eliminated (because he may be required to carry utensils) and the cleaner/polisher job were eliminated (because he may work with a knife).  Doc. 17, p. 13.  In his Reply brief, Kochheiser argues that the ALJ must determine, based on VE testimony, whether jobs would be eliminated based on Dr. Boutros's precautions.  Doc. 18, p. 5.  However, Kochheiser makes no attempt to demonstrate how the inspector and hand packager job would be unavailable even if Dr. Boutros's precautions were considered.  Since Kochheiser has made no attempt to show that a different result would occur if remand was ordered, the undersigned finds error, if any, with

---

[11] When asked at the hearing about his driving ability, Kochheiser indicated he did not drive because, after losing his driver's license in 1996, he started getting sick and does not like to drive. Tr. 33.  He did not indicate that he was precluded from driving due to a seizure precaution.

respect to the ALJ's failure to discuss Dr. Boutros's treatment record containing precautionary seizure instructions to be harmless.  *See e.g., Robertson v. Colvin*, 2015 WL 1534574, * 4 (S.D. Miss. Apr. 6, 2015) (finding an ALJ's failure to address environmental restrictions contained in a medical report harmless error where jobs identified by the ALJ as being within the claimant's RFC did not include restrictions outlined in the medical report).

## C.    The ALJ did not err in considering evidence relating to Kochheiser's prostate cancer or alleged fatigue

Kochheiser argues that the ALJ improperly isolated his fatigue from his cancer and radiation treatment when assessing whether his condition and resulting symptoms met the 12-month durational requirement.  Doc. 15, pp. 16-17 (referring to 20 C.F.R. § 416.909[12] and SSR 82-52[13]).

The ALJ found that one of Kochheiser's severe impairments was carcinoma of the prostate, status post prostatectomy and radiation therapy.  The ALJ considered and, at various points in his decision, discussed Kochheiser's prostate cancer and allegations of fatigue caused by the radiation therapy.  Tr. 17, 19, 20, 21.  The ALJ determined that records regarding Kochheiser's prostate cancer showed no evidence of lymph node involvement or carcinoma recurrence.  Tr. 20.  Kochheiser has not challenged that finding.  Kochheiser also has not challenged the ALJ's finding that, prior to his cancer treatment, there was no indication of symptoms of fatigue.  Further, the ALJ fully considered and took into account Kochheiser's prostate cancer as well as his resulting fatigue when assessing his RFC, stating, "While the claimant's lumbar pain and general fatigue would limit his ability to perform strenuous, heavy

---

[12] 20 C.F.R. § 416.909 explains that the duration requirement means, "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."

[13] SSR 82-52 states and explains "the policy regarding the duration requirement under the disability provisions of titles II and XVI of the Social Security Act and implementing regulations."

work, the objective medical evidence demonstrates that he is able to move about normally, walk without ambulatory aids, and perform a variety of daily activities.  Therefore, a limitation to range of light work activity is generally supported by the weight of the evidence."  Tr.  21.

Kochheiser takes issue with the ALJ's statement that "While recent treatment records demonstrated some increased fatigue following his treatment for carcinoma, earlier records do not demonstrate these symptoms, and there is no evidence that these symptoms and any resulting limitations will last at least 12 months."  Tr. 20-21.  It appears that Kochheiser is arguing that the ALJ should have started his "12-month" calculation from March 2012 when he began seeing a urologist and started undergoing tests and treatment for his prostate cancer because, starting then, Kochheiser would have been unable to adapt to a new job.  Doc. 15, pp. 16-17.  The Commissioner argues that Kochheiser has failed to demonstrate any functional effects between March 2012 and the date of his surgery in May 2012.  Doc. 17, p. 12.  Other than his conclusory statement that, "[s]tarting with March 1, 2012, when Kochheiser went to the urologist for prostate exam and tests, he had such intensive treatment, consultations, and follow-ups that he could not have adapted to a new job at that time," (Doc. 15, pp. 16-17), Kochheiser points to no record evidence upon which he relies to support his contention that he was unable to work because of prostate cancer treatment he was receiving prior to his prostate surgery.  Kochheiser contends, however, that whether there is enough proof as to whether he was disabled during the period from his cancer diagnosis through radiation therapy is for the ALJ to decide.  Doc. 18, pp. 5-6.   Yet, without pointing to any evidence to support his contention, Kochheiser is unable to demonstrate that remand would be anything other than a futile act.  *Todd v. Astrue*, 2012 WL 2576435, *10 (N.D. Ohio 20*12) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand

might lead to a different result.") (quoting *Shkarbari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005)) , *report and recommendation adopted*, 2012 WL 2576282 (N.D. Ohio 2012).

In light of the foregoing, the undersigned finds no error with respect to the ALJ's consideration and evaluation of Kochheiser prostate cancer and limitations resulting therefrom. Further, the undersigned finds that the ALJ explained how he accounted for Kochheiser's allegations of fatigue in the RFC and Kochheiser has failed to demonstrate that the ALJ's decision is not supported by substantial evidence.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

June 12, 2015

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).